**COMMONWEALTH of Pennsylvania**

v.

**Sandra REYNOLDS, Appellant.**

**Commonwealth of Pennsylvania**

v.

**Sandra Reynolds,**

**Appeal of: Pennsylvania Game Commission.**

Commonwealth Court of Pennsylvania.

Argued March 1, 2005.

Decided June 16, 2005.

C. Richard Morton, West Chester, for appellant, Sandra Reynolds.

Bradley C. Bechtel, Asst. Counsel, Harrisburg, for appellee, Commonwealth of Pennsylvania.

BEFORE: PELLEGRINI, Judge, LEAVITT, Judge, and KELLEY, Senior Judge.

OPINION BY Senior Judge KELLEY.

In these consolidated appeals, Sandra Reynolds and the Pennsylvania Game Commission (Commission) appeal from the order of the Court of Common Pleas of Chester County (trial court) granting in part, and denying in part, Reynolds' motion for return of property.[1] We vacate and remand.

1. Rule 588 of the Pennsylvania Rules of Criminal Procedures provides, in pertinent part:

On March 21, 2003, Commission Officer Keith Mullin obtained and executed a search warrant at Reynolds' residence in Chester County, Pennsylvania. The Officer seized Reynolds' business records and thirteen animals that were in her possession. The animals that were seized included four serval cats[2], two fennic foxes[3], three ringtailed lemurs[4], three kinkajous[5] and one wallaby.

On October 1, 2003, Officer Mullin issued six citations which alleged that Reynolds' possession of the serval cats and fennic foxes constituted a violation of Section 2962(c)(1)[6] of the Pennsylvania Game and Wildlife Code (Game Code) in that she unlawfully possessed this "exotic wildlife" without first securing the required dealer permit. Officer Mullin also issued seven citations which alleged that Reynolds' possession of the ringtailed lemurs, the kinkajous and the wallaby constituted a violation of Section 2163(b)[7] of the Game Code in that she unlawfully possessed this "wild-

(A) A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such a motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

(B) The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

Pa.R.Crim.P. 588(A), (B).

2. A serval cat is defined as "[a] wildcat (*Felis capensis* or *F. serval*) common in Africa having long legs, large untufted ears, and a tawny coat with black spots and rings." Webster's Third New International Dictionary 2075 (1986).

3. A fennic fox is defined as "[a] small African fox (*Fenecus zerda*) of a pale fawn color that is remarkable for the large size of its ears." Webster's Third New International Dictionary 838 (1986).

4. A ringtailed lemur is defined as a Madagascar cat which, in turn, is defined as "[a] small lemur (*Lemur catta*) having the tail barred with black." Webster's Third New International Dictionary 1356 (1986).

5. A kinkajou is defined as "[a] nocturnal arboreal carnivorous mammal (*Potos caudivolvulus* syn. *Cercoleptes caudivolvulus*) of the family Procyonidae inhabiting Mexico and Central and So. America that is about three feet long with a slender body, long prehensile tail, large lustrous eyes, and soft woolly yellowish brown fur." Webster's Third New International Dictionary 1245 (1986).

6. 34 Pa.C.S. § 2962(c)(1). Section 2962 provides, in pertinent part:

(a) **Authorization.**—The commission may issue a permit to a person to act as an exotic wildlife dealer. The permit shall authorize the holder to import into this Commonwealth, possess, buy, sell, locate or find for a fee, barter, donate, give away or otherwise dispose of exotic wildlife....

\* \* \*

(c) **Unlawful acts.**—It is unlawful for any person to:

(1) Import into this Commonwealth, possess, buy, sell, locate or find for a fee, barter, donate, give away or otherwise dispose of more than ... one animal classified as exotic wildlife in any calendar year without first securing a permit issued under this section.

34 Pa.C.S. § 2962(a), (c)(1).

In turn, Section 2961 of the Game Code defines "exotic wildlife" as "[a]ll bears, coyotes, lions, tigers, leopards, jaguars, cheetahs, cougars, wolves and any crossbreed of these animals which have similar characteristics in appearance or features. The definition is applicable whether or not the ... animals were bred or reared in captivity or imported from another state or nation." 34 Pa.C.S. § 2961.

Likewise, Section 2961 of the Game Code defines "exotic wildlife dealer" as "[a]ny person who imports into this Commonwealth, possesses, buys, sells, locates or finds for a fee, barters, donates, gives away or otherwise disposes of more than one bird or one animal classified as exotic wildlife by this subchapter." *Id.*

7. 34 Pa.C.S. § 2163(b). Section 2163 of the Game Code provides, in pertinent part:

life" with the intent to sell. On November 17, 2003, following a summary trial before a district justice, Reynolds was acquitted of all of the charges.

On November 25, 2003, Reynolds filed the instant motion pursuant to Pa. R.Crim.P. 588, seeking the return of twelve of the animals seized by the Commission.[8] On December 3, 2003, a hearing was conducted before the trial court on Reynolds' motion. *See* N.T. 12/3/03 [9] at 2–65.[10] On December 23, 2003, the trial court issued an order granting Reynolds' motion.

On January 12, 2004, the trial court granted the Commission's motion for reconsideration of the order granting Reynolds' motion. On January 28, 2004, another hearing was conducted before the trial court on Reynolds' motion. *See* N.T. 1/28/04 [11] at 21. At the hearing, the Commission contested the return of the animals. Specifically, the Commission alleged that Section 322(c) of the Game Code [12] specifically empowers it to add or change the classification of any wild animal contained in the Game Code, and that Section 2102 of the Game Code [13] specifically

**(b) Further restrictions.**—It is unlawful *to bring into, sell* or possess any game or wildlife … or to release within this Commonwealth, for any purpose, imported game or wildlife or game or wildlife reared in captivity or in a domestic state in this Commonwealth contrary to any regulations the commission promulgates to safeguard the native game or wildlife of this Commonwealth.

\* \* \*

**(d) Contraband.**—Any game or wildlife … possessed by any person contrary to this section is contraband.

34 Pa.C.S. § 2163(b), (d).

In turn, Section 102 of the Game Code defines "wildlife" as "[w]ild birds, wild mammals and facsimiles thereof, regardless of classification, whether protected or unprotected, including any part, product, egg or offspring thereof.…" 34 Pa.C.S. § 102.

8. The wallaby died after it was seized by the Commission.

9. "N.T. 12/3/03" refers to the transcript of the hearing conducted before the trial court on December 3, 2003.

10. At the hearing, Reynolds testified that she was licensed to sell the animals by the United States Department of Agriculture (USDA) pursuant to the provisions of the Animal Welfare Act, 7 U.S.C. § 2131–2159. *See* N.T. 12/3/03 at 29–31. However, the Commission's Assistant Director of the Bureau of Law Enforcement, Gregory Houghton, testified that Reynolds had never been issued an exotic wildlife dealer permit, an exotic wildlife possession permit or a wildlife menagerie permit by the

Commission pursuant to the provisions of Sections 2962, 2963 and 2964 of the Game Code, 34 Pa.C.S. § 2962(a), 2963(a), 2964(a). *See id.* at 45–46.

11. "N.T. 1/28/04" refers to the transcript of the hearing conducted before the trial court on January 28, 2004.

12. Section 322(c) of the Game Code provides, in pertinent part:

**(c) Specific powers and duties.**—In order to administrate and enforce this title, the commission through proper action shall:

\* \* \*

(8) Add to or change the classification of any wild bird or wild animal.

(9) Prohibit the possession, importation, exportation or release of any species of birds or animals which may be considered dangerous or injurious to the general public or to the wildlife of this Commonwealth.

34 Pa.C.S. § 322(c)(8), (9).

In turn, Section 102 of the Game Code defines "wild animals" as "[a]ll mammals other than domestic animals as defined in 1 Pa.C.S. § 1991 (relating to definitions)." 34 Pa.C.S. § 102. Further, Section 1991 of the Statutory Construction Act of 1972 defines "domestic animal" as "[a]ny equine animal, bovine animal, sheep, goat and pig." 1 Pa. C.S. § 1991.

13. Section 2102 of the Game Code provides, in pertinent part:

**(c) Transportation, sale and disturbance of game or wildlife.**—The commission shall promulgate regulations concerning the

empowers it to adopt regulations concerning game or wildlife in the Commonwealth. Additionally, the Commission argued that the animals constitute contraband *per se* in that they are either "wildlife" or "exotic wildlife" as defined in the Game Code and the Commission's regulations.[14] As a result, the Commission argued that Reynolds' possession of the animals would constitute a violation of the Game Code.

On March 31, 2004, the trial court issued an opinion and order granting in part, and denying in part, Reynolds' motion. Specifically, the trial court determined that the serval cats and fennic foxes were "wildlife" or "exotic wildlife" as defined by the Game Code and the regulations. As a result, the

trial court denied Reynolds' motion for the return of the serval cats and fennic foxes. *See* Trial Court Opinion 3/31/04 at 4, 6.

 However, the trial court determined that kinkajous and the lemurs were not "wildlife" or "exotic wildlife" as defined by the Game Code and the regulations. As a result, the trial court granted Reynolds' motion for the return of the kinkajous and the lemurs. *See Id.* at 4–5, 6. Reynolds has appealed that portion of the trial court's order denying the motion for the return of serval cats and fennic foxes; the Commission has filed a cross-appeal from that portion of the trial court's order granting the motion for the return of the kinkajous and the lemurs.[15,16]

---

transportation, introduction into the wild, importation, exportation, sale, offering for sale or purchase of game or wildlife or the disturbing of game or wildlife in their natural habitat.

\* \* \*

(e) **Penalties.—**

(1) Unless otherwise· specifically provided, any person convicted or pleading guilty to or pleading nolo contendere to any violation of any regulation promulgated under this title where any game or wildlife is unlawfully possessed, killed or taken or any attempt is made to unlawfully kill, take or possess any game or wildlife shall be subject· to the penalties imposed under section 2307(d) (relating to unlawful taking or possession of game or wildlife).

(2) Unless otherwise specifically provided, any other violation of any regulation of the commission is a summary offense of the fifth degree

34 Pa.C.S. § 2102(c), (e).

14. Specifically, Section 137.1(a)(10) of Title 58 of the Pennsylvania Code provides:

(a) Unless otherwise provided in this section or the [Game Code], it is unlawful for a person to import, possess, sell offer for sale or release within this Commonwealth the following animals or birds or the eggs of birds or a crossbreed or hybrid of the animals or birds, which are similar in appearance:

\* \* \*

(10) *Game or wildlife held captive.* Game or wildlife held in captivity or captive bred in another state or nation.

58 Pa.Code § 137.1(a)(10).·

Additionally, Section 147.2(a) of Title 58 of the Pennsylvania Code defines "exotic wildlife" as "[m]embers of the family Felidae except those species commonly called house cats and members of the family Canidae except those licensed by the Department of Agriculture.".· 58 Pa.Code § 147.2(a).

15. Initially, both Reynolds and the Commission filed the instant cross-appeals from the trial court's order with the Superior Court of Pennsylvania. However, by order filed May 26, 2004, the Superior Court transferred the cross-appeals to this Court.

16. This Court's scope of review of a trial court's decision on a motion for the return of property is limited to determining whether the trial court's findings are supported by competent evidence and whether the trial court abused its discretion of committed an error of law. *Commonwealth v. Wintel, Inc.,* 829 A.2d 753 (Pa.Cmwlth.2003). In a motion for the return of property, Pa.R.Crim.P. 588 requires that the moving party demonstrate lawful possession of the property. *Id.* Then the burden shifts to the Commonwealth to defeat the motion by showing that the property is contraband or derivative contraband. *Id.*

In this appeal, Reynolds claims [17]: (1) the trial court erred in determining that the Commission is not collaterally estopped from arguing that any of the animals are contraband; (2) the trial court erred in failing to order the return of the serval cats and fennic foxes as they are not contraband. In its cross-appeal, the Commission claims that the trial court erred in ordering the return of the kinkajous and the lemurs as all of the animals constitute contraband *per se*.

■ Reynolds first claims that the trial court erred in determining that the Commission is not collaterally estopped from arguing that any of the animals are contraband. Specifically, Reynolds asserts that, as she was acquitted of all of the charges concerning the unlawful possession of the animals, the Commission is collaterally estopped from arguing that the animals are contraband and that her continued possession of the animals would be illegal.

■ It is well settled that a proceeding seeking the return of property is quasi-criminal in character, but it is civil in form. *In re One 1988 Toyota Corolla,* 675 A.2d 1290 (Pa.Cmwlth.1996). It is equally well settled:

> [t]hat resolution of criminal charges in favor of a criminal defendant does not bar subsequent civil or administrative proceedings concerning the same underlying misconduct.... [A] judgment or sentence in a criminal prosecution is neither a bar to a subsequent civil proceeding found on the same facts, nor is it proof of anything in such civil proceeding, except the mere fact of rendition. So, where the same acts or transactions constitute a crime and also give a right of action for damages or for a penalty,

> the acquittal of [a] defendant when tried for the criminal offense is no bar to the prosecution of the civil action against him, nor is it evidence of his innocence in such action....

*Spence v. Pennsylvania Game Commission,* 850 A.2d 821, 823 (Pa.Cmwlth.2004). Thus, an acquittal in criminal proceedings has no preclusive effect in a subsequent proceeding on a motion for the return of property, and Reynolds' claim to the contrary is without merit. *See, e.g., Commonwealth v. Trayer,* 687 A.2d 33, 34 (Pa. Cmwlth.1996) ("[W]e concluded therein that the forfeiture statute did not violate the Double Jeopardy provision of either the state or the federal Constitutions because the statute serves the purpose of depriving the defendant of the means to commit additional offenses and helps to defray the costs of investigation and prosecution. Insofar as a statute can be fairly characterized as remedial, and not solely a deterrent or retributive statute, it does not impinge on constitutional protections against double jeopardy.") (citation omitted); *Commonwealth v. Anthony,* 418 Pa.Super. 82, 613 A.2d 581, 583 (1992) ("[T]his is not to say, however, that the Commonwealth's right to seek forfeiture is contingent upon the result in a criminal prosecution. Regardless of whether a conviction can be gained from the evidence, the Commonwealth may seek to forfeit property as long as it establishes that the property constitutes contraband.") (citations and footnote omitted).

■ Finally, Reynolds claims that, although the trial court correctly ordered the return of the kinkajous and the lemurs, the trial court erred in failing to order the return of the serval cats and fennic foxes as they are not contraband. In its cross-

---

**17.** In the interest of clarity, we consolidate and reorder the claims raised by Reynolds in the instant appeal.

appeal, the Commission claims that the trial court erred in ordering the return of the kinkajous and the lemurs as all of the animals seized from Reynolds constitute contraband *per se.*

As noted above, in support of her motion for the return of her animals, Reynolds testified at the hearing before the trial court that she was licensed by the USDA to sell the animals pursuant to the provisions of the Animal Welfare Act, 7 U.S.C. § 2131–2159. *See* N.T. 12/3/03 at 29–31. In support of its position that the animals constituted contraband, the Commission's Assistant Director of the Bureau of Law Enforcement testified that Reynolds had never been issued an exotic wildlife dealer permit, an exotic wildlife possession permit or a wildlife menagerie permit by the Commission pursuant to the provisions of Sections 2962, 2963 and 2964 of the Game Code, 34 Pa.C.S. § 2962, 2963, 2964. *See id.* at 45–46. Unfortunately, the trial court made no findings or determination in this regard in disposing of Reynolds' motion for the return of the animals.

As the Pennsylvania Superior Court has noted:

The law of contraband is ancient but evolving. Originally a forfeiture proceeding was considered a purely *in rem* civil action against the property. Courts have come to recognize, however, that in substance the proceeding may be more criminal than civil, and consequently they will afford the owner some of the procedural safeguards normally relevant only to criminal actions.

In this evolution, two distinct classifications of contraband have been developed: contraband *per se,* and derivative contraband. Contraband *per se* is property the mere possession of which is unlawful. Heroin and "moonshine" whiskey are examples of contraband *per se.* Derivative contraband is property innocent by itself, but used in the perpetration of an unlawful act. An example of derivative contraband is a truck used to transport illicit goods.

*Commonwealth v. Fassnacht,* 246 Pa.Super. 42, 369 A.2d 800, 802 (1977), *cert. denied sub nom. Fassnacht v. Pennsylvania,* 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 257 (1979) (footnotes and citations omitted). Thus, in order "[t]o determine whether property is contraband, and if so, what type of contraband, one must refer to the nature of the property and to the statute or statutes that it is contended make possession of the property or its use unlawful." *Fassnacht,* 369 A.2d at 803.[18]

The purpose of the Animal Welfare Act is to ensure that "[a]nimals intended ... for use as pets are provided humane care and treatment." 7 U.S.C. § 2131. Under Section 3, the Secretary of the USDA is vested with the authority to issue licenses to "dealers" of "animals". 7 U.S.C. § 2133.[19] In turn, Section 2 defines "deal-

18. It should be noted that, in pertinent part, Section 102 of the Game Code defines "contraband" as:

[A]ny game or wildlife, or part or product thereof ... when the game or wildlife, or part or product thereof ... is held in possession, transported or used or taken in violation of any law, the enforcement or administration of which is vested in the commission. Contraband shall be forfeited to the commission to be disposed of at the discretion of the director.

34 Pa.C.S. § 102

19. With respect to licensing, Section 2.1 of Title 9 of the Code of Federal Regulations provides, in pertinent part:

(a)(1) Any person operating, or intending to operate as a dealer ... except persons who are exempted from the licensing requirements under paragraph (a)(3) of this section, must have a valid license. A person must be 18 years of age or older to obtain a license. A person seeking a li-

er", in pertinent part, as "[a]ny person who, in commerce, for compensation or profit ... buys, or sells, or negotiates the purchase or sale of ... any dog or other animal whether alive or dead for ... use as a pet...." 7 U.S.C. § 2132.[20] In addition, Section 2 defines "animal", in pertinent part, as "[a]ny live or dead dog, cat, monkey (nonhuman primate mammal), guinea pig, hamster, rabbit, or such other warm-blooded animal, as the Secretary may determine is being used ... as a pet...." *Id.*[21]

Moreover, Section 4 of the Animal Welfare Act provides, in pertinent part, that "[n]o dealer ... shall sell or offer to sell or transport or offer for transportation, in commerce, ... or for use as a pet any animal ... until such dealer ... shall have obtained a license from the Secretary and such license shall not have been suspended or revoked." 7 U.S.C. § 2134.[22] Further-

cense shall apply on a form which will be furnished by the AC Regional Director in the State in which that person operates or intends to operate. The applicant shall provide the information requested on the application form, including a valid mailing address through which the licensee or applicant can be reached at all times, and a valid premises address where animal, animal facilities, equipment, and records may be inspected for compliance. The applicant shall file the completed application form with the AC Regional director.

\* \* \*

(3) The following persons are exempt from the licensing requirements under section 2 or 3 of the Act:

\* \* \*

(iii) Any person who maintains a total of three (3) or fewer breeding female dogs, cats, and/or small exotic or wild mammals, such as hedgehogs, degus, spiny mice, prairie dogs, flying squirrels, and jerboas, and who sells only the offspring of these dogs, cats, or small exotic or wild mammals, which were born and raised on his or her premises, for pets or exhibition, and is not otherwise required to obtain a license. This exemption does not extend to any person residing in a household that collectively maintains a total of more than three breeding female dogs, cats, and/or small exotic or wild mammals, regardless of ownership, nor to any person maintaining breeding female dogs, cats, and/or small exotic or wild mammals on premises on which more than three breeding female dogs, cats, and/or exotic or wild mammals are maintained....

9 C.F.R. § 2.1(a)(1), (3)(iii).

**20.** *See also* Section 1.1 of Title 9 of the Code of Federal Regulations which defines "dealer" as "[a]ny person who, in commerce, for compensation or profit, ... buys, or sells, or negotiates the purchase or sale of: Any dog or other animal whether alive or dead ... for use as a pet...." 9 C.F.R. § 1.1.

**21.** *See also* Section 1.1 of Title 9 of the Code of Federal Regulations which defines "animal" as "[a]ny live or dead dog, cat, nonhuman primate, guinea pig, hamster, rabbit, or any other warm-blooded animal, which is being used, or is intended for use ... as a pet...." 9 C.F.R. § 1.1.

In addition, Section 1.1 defines "exotic animal" as:
[A]ny animal not identified in the definition of "animal" provided in this part that is native to a foreign country or of foreign origin or character, is not native to the United States, or was introduced from abroad. This term specifically includes animals such as, but not limited to, lions, tigers, leopards, elephants, camels, antelope, anteaters, kangaroos, and water buffalo, and species of foreign domestic cattle, such as Ankole, Gayal, and Yak.
*Id.*
Further, Section 1.1 defines "wild animal" as "[a]ny animal which is now or historically has been found in the wild, or in the wild state, within the boundaries of the United States, it territories, or possessions...." *Id.*

**22.** *See also* Section 1.1 of Title 9 of the Code of Federal Regulations which defines "Class 'A' licensee (breeder)" as "[a] person subject to the licensing requirements under part 2 and meeting the definition of a 'dealer' (§ 1.1), and whose business involving animals consists only of animals that are bred and raised on the premises in a closed or stable colony and those animals acquired for the sole purpose of maintaining or enhancing the

more, Section 13(a)(1) authorizes the Secretary to "[p]romulgate standards to govern the humane handling, care treatment, and transportation of animals by dealers...." 7 U.S.C. § 2143(a)(1). The failure of a dealer to comply with the provisions of the Animal Welfare Act, or the regulations promulgated thereunder, exposes the dealer to both the revocation of her license, and civil and criminal penalties, under Section 19 of the Act.[23]

However, the USDA's regulation in this field is not exclusive. Indeed, Section

breeding colony."; and which defines "Class 'B' licensee" as "[a] person subject to the licensing requirements under part 2 and meeting the definition of a 'dealer' (§ 1.1), and whose business includes the purchase and/or resale of any animal...." *Id.*

23. *See* Section 19(a), 7 U.S.C. § 2149(a) ("[I]f the Secretary has reason to believe that any person licensed as a dealer ... has violated or is violating any provision of this chapter, or any of the rules or regulations or standards promulgated by the Secretary hereunder, he may suspend such person's license temporarily ... and after notice and opportunity for hearing, may suspend for such additional period as he may specify, or revoke such license, if such violation is determined to have occurred."); Section 19(b), 7 U.S.C. § 2149(b) ("[A]ny dealer ... that violates any provision of this chapter, or any rule, regulation or standard promulgated by the Secretary thereunder, may be assessed a civil penalty by the Secretary of not more than $2,500 for each such violation, and the Secretary may also make an order that such person shall cease and desist from continuing such violation.... Any person who knowingly fails to obey a cease and desist order made by the Secretary under this section shall be subject to a civil penalty of $1,500 for each offense, and each day during which such failure continues shall be deemed a separate offense."); Section 19(d), 7 U.S.C. § 2149(d) ("[A]ny dealer ... who knowingly violates any provision of this chapter shall, on conviction thereof, be subject to imprisonment for not more than 1 year, or a fine of not more than $2,500, or both.").

13(a)(8) provides that "[p]aragraph (1) shall not prohibit any State (or political subdivision of such State) from promulgating standards in addition to those standards promulgated by the Secretary under paragraph (1)." 7 U.S.C. § 2143(a)(8).[24] Thus, although Reynolds may have been issued a license by the USDA to sell the animals seized by the Commission, the Supremacy Clause of the United States Constitution[25] may not preclude regulation by the Commission to the extent that the Game Code does not conflict with the Animal Welfare Act.[26]

24. *See also* Section 15(b) of the Animal Welfare Act, 7 U.S.C. § 2145(b) ("[T]he Secretary is authorized to cooperate with the officials of the various States or political subdivisions thereof in carrying out the purposes of this chapter and of any State, local, or municipal legislation or ordinance on the same subject.").

25. Clause 2 of Article 6 of the United States Constitution provides, in pertinent part, that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

26. *See, e.g., DeHart v. Town of Austin, Indiana,* 39 F.3d 718 (7th Cir.1994) (A local ordinance prohibiting the possession of wild animals or animals capable of inflicting serious physical harm or death to human beings was not preempted by the Animal Welfare Act, as the Act expressly contemplated state and local regulation of animals, and there was no showing that it was physically impossible to comply with both the federal and local regulations.); *Kerr v. A.T. Kimmell,* 740 F.Supp. 1525, 1529–1530 (D.Kan.1990) ("[T]he court finds that plaintiff has not shown that any of the above-mentioned methods of preemption apply in this case. To the contrary, it is clear that the federal law does not evince an intent to preempt state regulation of animal welfare. Sections 2143(a)(8) (the savings clause) and 2145(b) of Title 7, United States Code, show that Congress antic-

With respect to Pennsylvania law, Section 2962(a) of the Game Code provides, in pertinent part:

> [T]he commission may issue a permit to a person to act as an exotic wildlife dealer. The permit shall authorize the holder to import into this Commonwealth, possess, buy, sell, locate or find for a fee, barter, donate, give away or otherwise dispose of exotic wildlife. A dealer ... who arranges any trades, sales or purchases ... for any type of fee, reimbursement or commission shall be required to have an exotic wildlife dealer's permit.

34 Pa.C.S. § 2962(a).[27] Section 2961 of the Game Code defines "exotic wildlife dealer" as "[a]ny person who ... possesses, buys, sells, locates or finds for a fee, barters, donates, gives away or otherwise disposes of more than ... one animal *classified as exotic wildlife by this sub chapter.*" 34 Pa.C.S. § 2961 (emphasis added).[28] In turn, Section 2961 of the Game Code defines "exotic wildlife" as including, "[b]ut not limited to, all bears, coyotes, lions, tigers, leopards, jaguars, cheetahs, cougars, wolves and any crossbreed of these animals which have similar characteristics in appearance or features. The definition is applicable whether or not the ... animals were bread or reared in captivity or imported from another state or nation." 34 Pa.C.S. § 2961.[29]

In sum, in order to constitute contraband *per se,* as alleged by the Commission, Reynolds' possession of the animals must be in violation of the relevant statutes. Thus, as a threshold matter, the trial court must first make the initial finding of whether or not Reynolds is licensed as a "dealer" of the animals by the USDA under the relevant provisions of the Animal Welfare Act and the USDA's regulations. If so, the trial court must also determine whether or not the relevant provisions of the Game Code and the Commission's regulations have been preempted by the federal statute and regulations, and to what extent they have been preempted. If not, the trial court must then make the finding of whether or not Reynolds has been issued a permit by the Commission under the relevant state statute and regulations. It is only after these preliminary findings and determinations have been made that the ultimate determination of whether or not the animals constitute contraband *per se* may occur. As a result, this case must be remanded to the trial court for such findings and determinations.[30]

---

ipated that states would remain active in this area of traditional state interest. Thus, plaintiff's argument that Congress intended to totally occupy the field of animal welfare is belied by the express language of the federal statute cited above.") (footnote omitted).

**27.** Likewise, Section 2963(a) provides that "[t]he commission may issue permits to persons to possess exotic wildlife which shall authorize the holder to purchase, receive or possess exotic wildlife from any lawful source from within or without this Commonwealth." 34 Pa.C.S. § 2963(a).

**28.** The definition contained in the Game Code would prevail over a definition contained in the Commission's regulations to the extent that they are in conflict. *See Commonwealth*

*v. DeFusco,* 378 Pa.Super. 442, 549 A.2d 140, 145 (1988) ("[W]here as here, there is an apparent conflict between a statute and regulation promulgated thereunder, the statute must prevail.") (citations omitted).

**29.** We have not found corresponding permitting provisions in the Game Code relating to "wildlife" as defined in Section 102 of the Code. However, Section 137.1(c) of the Commission's regulations provides that "[n]othing in this section prevents ... exotic wildlife dealers or exotic wildlife permit holders from importing wildlife." 58 Pa.Code § 137.1(c).

**30.** As noted above, Section 102 of the Game Code defines "contraband" as "[a]ny game or wildlife, or part or product thereof ... when the game or wildlife, or part or product there-

Accordingly, the order of the trial court is vacated, and the case is remanded to the trial court for proceedings consistent with this opinion.

### ORDER

AND NOW, this 16th day of June, 2005, the order of the Court of Common Pleas of Chester County, dated March 31, 2004 at No. M–0551–03, is VACATED and the matter is REMANDED for proceedings consistent with this opinion.

Jurisdiction is RELINQUISHED.

of ... is held in possession, transported or used or taken in violation of any law, the enforcement or administration of which is vested in the commission...." 34 Pa.C.S. § 102. Section 102 further provides that "[c]ontraband shall be forfeited to the commission to be disposed of at the discretion of the director." *Id.* However, this Court has previously determined that the foregoing forfeiture provision of the Game Code is invalid as it is unconstitutional. *See Reeves v. Pennsylvania Game Commission,* 136 Pa.Cmwlth. 667, 584 A.2d 1062, 1068 (1990) ("[T]he forfeiture provision of the Code fails to provide for notice and a hearing as required for an in rem forfeiture proceeding and, therefore, violates the due process clause of the United States Constitution. Until such time that the forfeiture provision of the Code is amended to provide for in rem forfeiture proceedings which comport with due process, automatic forfeitures under the existing provision are unconstitutional.") (footnote omitted). As a result, in disposing of the instant motion for the return of property, the trial court must also address what should be done with the animals in the event that the motion is denied as the Commission is without the statutory authority to retain the animals as forfeited contraband.